## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

REALTIME ADAPTIVE STREAMING )
LLC, )
          Plaintiff, )
 )
v. )      Civil Action No. 17-1692-CFC-SRF
 )
NETFLIX, INC., and NETFLIX )
STREAMING SERVICES, INC., )
 )
 )
          Defendants. )

## REPORT AND RECOMMENDATION

### I.    INTRODUCTION

On November 21, 2017, Realtime Adaptive Streaming LLC ("Realtime") originally filed

this patent infringement action against Netflix, Inc. and Netflix Streaming Services, Inc.

(collectively, "Netflix"), asserting infringement of United States Patent Numbers 8,934,535 ("the

'535 patent"), 9,769,477 ("the '477 patent"), 9,762,907 ("the '907 patent"), and 7,386,046 ("the

'046 patent") (collectively, the "Fallon patents").[1]  (D.I. 1 at ¶ 8)  Additionally, Realtime asserts

Netflix's infringement of United States Patent Numbers 8,634,462 ("the '462 patent") and

9,578,298 ("the '298 patent") (collectively, the "Non-Fallon patents").  (*Id.*)  Realtime is the

owner by assignment of the patents-in-suit, which relate to the concept of encoding and decoding

data, and the digital compression of data.  (*Id.* at ¶¶ 9-14)  Pending before the court is the motion

to dismiss the Fallon patent claims for failure to state a claim pursuant to Federal Rule of Civil

---

[1] The Complaint's paragraphs are numbered incorrectly.  On pages 45 to 46, ¶ 95 is followed by
¶ 77 and, as a result, ¶¶ 77-95 are duplicated.  (*See* D.I. 1 at 45-46)  Citations to D.I. 1 at ¶¶ 77-
95 shall be followed by a page number or series of pages numbers in parentheses for clarity (i.e.,
*See* D.I. 1 at ¶ 77-95 (pg. 38-45)).

Procedure 12(b)(6) and 35 U.S.C. §101, the Non-Fallon patent claims pursuant to Federal Rule of Civil Procedure 12(b)(6), and the indirect infringement claims pursuant to Federal Rule of Civil Procedure 12(b)(6). (D.I. 11) For the following reasons, I recommend granting-in-part and denying-in-part Netflix's motion to dismiss.

## II.    BACKGROUND

### A. Procedural History

On February 5, 2018, Netflix filed this pending motion to dismiss for failure to state a claim. (D.I. 11) On April 10, 2018, Realtime filed a motion to transfer pursuant to 28 U.S.C. § 1407 with the United States Judicial Panel on Multidistrict Litigation ("the Panel") to consolidate in the District of Colorado actions it originally brought in Delaware, California, Texas, Massachusetts, and Colorado. (D.I. 19) On May 1, 2018, Netflix also filed a motion to transfer the present case to the Northern District of California. (D.I. 20) On August 1, 2018, the Panel denied Realtime's motion due to the need for defendant-by-defendant analysis of individual design elements. (D.I. 37)

On October 2, 2018, the court heard oral argument on the pending motion to dismiss.[2] (D.I. 42) On October 12, 2018, this court issued a Report and Recommendation denying Netflix's motion to transfer. (D.I. 44) District Judge Colm F. Connolly adopted the Report and Recommendation on November 9, 2018. (D.I. 46)

### B. Related Cases

There is a related Realtime case currently pending before the court, Realtime Adaptive Streaming LLC v. Haivision Network Video Inc., C.A. No. 17-1520-CFC-SRF (the "Haivision

---

[2] At oral argument, the court also heard arguments regarding a similar motion to dismiss in a related case, Realtime Adaptive Streaming LLC v. Haivision Network Video Inc., C.A. No. 17-1520-CFC-SRF. (D.I. 42; see also C.A. No. 17-1520-CFC-SRF, D.I. 23)

Litigation").[3] In the Haivision Litigation, Realtime asserts claims for infringement of the Fallon patents, as well as U.S. patent No. 8,929,442 ("the '442 patent"). (C.A. No. 17-1520-CFC-SRF, D.I. 1) There is a pending motion to dismiss the complaint for failure to state a claim pursuant to Rule 12(b)(6) and 35 U.S.C. § 101 filed by Haivision. (C.A. No. 17-1520-CFC-SRF, D.I. 23)

### C. Patents-in-Suit

The '535 patent is titled "Systems and Methods for Video and Audio Data Storage and Distribution." (D.I. 1 at ¶ 11) Representative claim 15 recites:

15. A method, comprising:

Determining a parameter of at least a portion of a data block;

Selecting one or more asymmetric compressors from among a plurality of compressors based upon the determined parameter or attribute;

Compressing the at least the portion of the data block with the selected one or more asymmetric compressors to provide one or more compressed data blocks; and

Storing at least a portion of the one or more compressed data blocks.

('535 patent, col. 22:1-12) The '477 patent is titled "Video Data Compression Systems." (D.I. 1 at ¶ 14) Representative claim 1 recites:

1. A system, comprising:

A plurality of different asymmetric data compression encoders,

---

[3] Two other related cases were before this court: (1) Realtime Adaptive Streaming LLC v. Brightcove Inc. et al, C.A. No. 17-1519-CFC-SRF (the "Brightcove Litigation"), and (2) Realtime Adaptive Streaming LLC v. Sony Electronics, Inc., C.A. No. 17-1693-CFC-SRF (the "Sony Litigation"). The parties in the Brightcove Litigation filed a joint motion to dismiss on October 29, 2018. (C.A. No. 17-1519-CFC-SRF, D.I. 40) On October 31, 2018, Judge Connolly dismissed plaintiff's claims with prejudice and defendant's claims without prejudice. (C.A. No. 17-1519-CFC-SRF, D.I. 41) The parties in the Sony Litigation also filed a joint motion to dismiss on November 1, 2018. (C.A. No. 17-1693-CFC-SRF, D.I. 27) On November 5, 2018, Judge Connolly dismissed plaintiff's claims with prejudice and defendant's claims without prejudice. (C.A. No. 17-1693-CFC-SRF, D.I. 28)

Wherein each asymmetric data compression encoder of the plurality of different asymmetric data compression encoders is configured to utilize one or more data compression algorithms, and

Wherein a first asymmetric data compression encoder of the plurality of different asymmetric data compression encoders is configured to compress data blocks containing video or image data at a higher data compression rate than a second asymmetric data compression encoder of the plurality of different asymmetric data compression encoders; and

One or more compressors configured to:

Determine one or more data parameters, at least one of the determined one or more data parameters relating to a throughput of a communications channel measured in bits per second; and

Select one or more asymmetric data compression encoders from among the plurality of different asymmetric data compression encoders based upon, at least in part, the determined one or more data parameters.

('477 patent, col. 20:57-21:13) The '907 patent is titled "System and Methods for Video and Audio Data Distribution." (D.I. 1 at ¶ 13) Representative claim 1 recites:

1. A system comprising:

One or more different asymmetric data compression algorithms, wherein each algorithm of the one or more different asymmetric data compression algorithms utilizes one or more asymmetric data compression routines of a plurality of different asymmetric data compression routines, wherein a first asymmetric data compression routine of the plurality of different asymmetric data compression routines is configured to produce compressed data with a higher data rate for a given data throughput than a second asymmetric data compression routine of the plurality of different asymmetric data compression routines; and

A processor configured:

To analyze one or more data parameters from one or more data blocks containing video data, wherein at least one data parameter relates to an expected or anticipated throughput of a communications channel; and

To select two or more different data compression routines from among a plurality of different data compression routines based upon, at least in part, the one or more data parameters relating to the expected or anticipated throughput of the communications channel.

4

('907 patent, col. 20:49-21:6) The '046 patent is titled "Bandwidth Sensitive Data Compression and Decompression." (D.I. 1 at ¶ 9) Representative claim 1 recites:

> 1. A method comprising:
>
> Compressing data using a first compression routine providing a first compression rate, wherein the first compression routine comprises a first compression algorithm;
>
> Tracking the throughput of a data processing system to determine if the first compression rate provides a throughput that meets a predetermined throughput threshold, wherein said tracking throughput comprises tracking a number of pending requests for data transmission; and
>
> When the tracked throughput does not meet the predetermined throughput threshold, compressing data using a second compression routine providing a second compression rate that is greater than the first compression rate, to increase the throughput of the data processing system to at least the predetermined throughput level, wherein the second compression routine comprises a second compression algorithm.

('046 patent, col. 20:14-32)

## III. LEGAL STANDARD

### A. Federal Pleading Standards under Rule 12(b)(6)

Rule 12(b)(6) permits a party to move to dismiss a complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). When considering a Rule 12(b)(6) motion to dismiss, the court must accept as true all factual allegations in the complaint and view them in the light most favorable to the plaintiff. *Umland v. PLANCO Fin. Servs. Inc.*, 542 F.3d 59, 64 (3d Cir. 2008).

To state a claim upon which relief can be granted pursuant to Rule 12(b)(6), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although detailed factual allegations are not required, the complaint must set forth sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft*

*v. Iqbal*, 556 U.S. 662, 663 (2009). A claim is facially plausible when the factual allegations allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Iqbal*, 556 U.S. at 663; *Twombly*, 550 U.S. at 555-56.

When determining whether dismissal is appropriate, the court must take three steps.[4] *See Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010). First, the court must identify the elements of the claim. *Iqbal*, 556 U.S. at 675. Second, the court must identify and reject conclusory allegations. *Id.* at 678. Third, the court should assume the veracity of the well-pleaded factual allegations identified under the first prong of the analysis, and determine whether they are sufficiently alleged to state a claim for relief. *Id.*; *see also Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). The third prong presents a context-specific inquiry that "draw[s] on [the court's] experience and common sense." *Iqbal*, 556 U.S. at 663-64; *see also Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). As the Supreme Court instructed in *Iqbal*, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

## B. Patent Eligibility under 35 U.S.C. § 101

Section 101 provides that patentable subject matter extends to four broad categories, including "new and useful process[es], machine[s], manufacture, or composition[s] of matter." 35 U.S.C. § 101; *see also Bilski v. Kappos*, 561 U.S. 593, 601 (2010) ("*Bilski II*"); *Diamond v. Chakrabarty*, 447 U.S. 303, 308 (1980). The Supreme Court recognizes three exceptions to the

---

[4] Although *Iqbal* describes the analysis as a "two-pronged approach," the Supreme Court observed that it is often necessary to "begin by taking note of the elements a plaintiff must plead to state a claim." 556 U.S. at 675, 679. For this reason, the Third Circuit has adopted a three-pronged approach. *See Santiago v. Warminster Twp.*, 629 F.3d 121, 130 n.7 (3d Cir. 2010); *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011).

statutory subject matter eligibility requirements: "laws of nature, physical phenomena, and abstract ideas." *Bilski II*, 561 U.S. at 601 (internal quotations omitted). In this regard, the Supreme Court has held that "[t]he concepts covered by these exceptions are 'part of the storehouse of knowledge of all men . . . free to all men and reserved exclusively to none.'" *Id.* at 602 (quoting *Funk Bros. Seed Co. v. Kalo Inoculant Co.*, 333 U.S. 127, 130 (1948)). At issue in the present case is the third category pertaining to abstract ideas, which "embodies the longstanding rule that an idea of itself is not patentable." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014) (internal quotations omitted).

In *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 566 U.S. 66 (2012), the Supreme Court articulated a two-step "framework for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." *Alice*, 134 S. Ct. at 2355. In accordance with the first step of the *Alice* test, the court must determine whether the claims at issue are directed to a patent-ineligible concept, such as an abstract idea. *See id.* If so, the court must turn to the second step, under which the court must identify an "'inventive concept'—*i.e.*, an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Id.* (internal citation omitted). The two steps are "plainly related" and "involve overlapping scrutiny of the content of the claims." *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016).

At step 1, "the claims are considered in their entirety to ascertain whether their character as a whole is directed to excluded subject matter." *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015); *see also Affinity Labs of Texas, LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1257 (Fed. Cir. 2016) ("The 'abstract idea' step of the inquiry calls upon us

to look at the 'focus of the claimed advance over the prior art' to determine if the claim's 'character as a whole' is directed to excluded subject matter."). However, "courts must be careful to avoid oversimplifying the claims by looking at them generally and failing to account for the specific requirements of the claims." *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1313 (Fed. Cir. 2016) (internal quotations and citations omitted). "Whether at step one or step two of the *Alice* test, in determining the patentability of a method, a court must look to the claims as an ordered combination, without ignoring the requirements of the individual steps." *Enfish, LLC v. Microsoft*, 822 F.3d 1327, 1338 (Fed. Cir. 2016).

At step 2, the Federal Circuit instructs courts to "look to both the claim as a whole and the individual claim elements to determine whether the claims contain an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *McRO*, 837 F.3d at 1312 (internal brackets and quotation marks omitted). Under the step 2 inquiry, the court must consider whether claim elements "simply recite 'well-understood, routine, conventional activit[ies].'" *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016) (quoting *Alice*, 134 S. Ct. at 2359) (alteration in original). "Simply appending conventional steps, specified at a high level of generality, [is] not enough to supply an inventive concept." *Alice*, 134 S. Ct. at 2357 (internal quotations omitted).

The Federal Circuit looks to the claims as well as the specification in performing the "inventive concept" inquiry. *See Affinity Labs*, 838 F.3d at 1271 ("[N]either the claim nor the specification reveals any concrete way of employing a customized user interface."). "The inventive concept inquiry requires more than recognizing that each claim element, by itself, was known in the art." *Bascom*, 827 F.3d at 1350. In *Bascom*, the Federal Circuit held that "the

8

limitations of the claims, taken individually, recite generic computer, network and Internet components, none of which is inventive by itself," but nonetheless determined that the patent adequately alleged an ordered combination of these limitations to be patent-eligible under step 2 at the pleading stage. *Id.* at 1349.

The "mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention" under step two. *Alice*, 134 S. Ct. at 2358. "Given the ubiquity of computers . . . wholly generic computer implementation is not generally the sort of additional feature that provides any practical assurance that the process is more than a drafting effort designed to monopolize the abstract idea itself." *Id.* (internal quotations and citations omitted). The Federal Circuit has held that certain improvements in computer software are not abstract ideas under *Alice* step one. *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016); *see also Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253, 1259 (Fed. Cir. 2017). The relevant question in determining if computer technology is directed to an abstract idea is whether the claims direct to an improvement on computer functionality itself, or an improvement on economic or other tasks for which a computer is merely used as a tool.[5] *Enfish*, 822 F.3d at 1335-36.

Patent eligibility under § 101 is a question of law suitable for resolution on a motion to dismiss for failure to state a claim under Rule 12(b)(6). *See In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 610 (Fed. Cir. 2016) (applying regional circuit law to the *de novo* review of a district court's patent eligibility determination under § 101 on a Rule 12(b)(6) motion to

---

[5] "Where the claims at issue provide for an improvement in the operation of a computer, such as a new memory system, a new type of virus scan, or a new type of interface that makes a computer function more accessible, the Federal Circuit has found the claims patent-eligible." *Epic IP LLC v. Backblaze, Inc.*, 2018 WL 6201582 (D. Del. Nov. 26, 2018) (citing *Data Engine Techs. LLC v. Google LLC*, 906 F.3d 999 (Fed. Cir. 2018)).

dismiss). However, the Federal Circuit recently emphasized that, "like many legal questions, there can be subsidiary fact questions which must be resolved en route to the ultimate legal determination." *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (Fed. Cir. 2018). "The question of whether a claim element or combination of elements is well-understood, routine and conventional to a skilled artisan in the relevant field is a question of fact[]" that goes beyond what was simply known in the prior art. *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018). On a motion to dismiss, this question of fact, like all questions of fact, must be resolved in the plaintiff's favor. *Aatrix Software, Inc.*, 882 F.3d at 1128.

## IV. DISCUSSION

### A. *Alice* Step 1

Applying the first step of the *Alice* framework to the asserted claims, the court concludes that the Fallon patents are directed to the abstract idea of encoding and decoding data, and the digital compression of data. As a preliminary matter, the court addresses a few recurring arguments between Netflix and Realtime. First, Netflix claims the representative claims are: claim 15 of the '535 patent, claim 1 of the '477 patent, claim 1 of the '907 patent, and claim 1 of the '046 patent. (D.I. 13 at 8, 11, 13, 14) Realtime does not explain why the court should not consider the claims representative in arguing that Netflix has failed to address each claim separately. (D.I. 14 at 15) Under *Content Extraction and Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343 (Fed. Cir. 2014), each claim does not need to be repeatedly attacked individually, so long as "all the claims are substantially similar and linked to the same abstract idea." *Content Extraction*, 776 F.3d at 1348 (internal quotations and citations omitted).

Here, the court recommends finding that that the above listed claims are representative of each of the Fallon patents. Similar to the plaintiff in *Content Extraction*, Realtime has not

10

identified claims that "it believe[s] would not be fairly represented" by these claims in a § 101 analysis. *Id.* Nor has Realtime identified "any other claims as purportedly containing an inventive concept." *Id.* Ultimately, Realtime has failed to "present any meaningful argument for the distinctive significance of any claim limitations not found in the representative claim[s]." *Berkheimer*, 881 F.3d at 1365 (citing *Elec. Power Grp.*, 830 F.3d at 1352; *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1316 & n.9 (Fed. Cir. 2016)). Therefore, for the purpose of our § 101 analysis, claim 15 of the '535 patent, claim 1 of the '477 patent, claim 1 of the '907 patent, and claim 1 of the '046 patent are representative of the Fallon patents.

Additionally, Realtime contends that claim construction should be completed to "illuminate the eligibility of the patents" prior to any § 101 analysis. (D.I. 14 at 15-16) However, "claim construction is not an inviolable prerequisite to a validity determination under § 101." *Content Extraction*, 776 F.3d at 1349 (affirming the district court's dismissal of the patent claims as "patent-ineligible under § 101 at the pleading stage"); *see also OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1360-62 (Fed. Cir. 2015) (affirming dismissal on the pleadings); *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 717 (Fed. Cir. 2014) (affirming Rule 12(b)(6) dismissal); *Modern Telecom Sys. LLC v. Juno Online Servs., Inc.*, 2015 WL 1240182, at *7 (C.D. Cal. Mar. 17, 2015) ("[A]fter *Alice*, courts have frequently decided patent-eligibility on the pleadings."). Realtime does not identify any claim construction issues that need resolution or any facts in dispute. *See Smart Software, Inc. v. PlanningEdge, LLC*, 192 F. Supp. 3d 243, 247 (D. Mass. 2016) (deciding § 101 eligibility without claim construction where plaintiff failed to offer any specific claim construction issues that would affect the analysis). Therefore, claim construction is not necessary and determining whether the patents-in-suit are patent eligible under § 101 is appropriate at this stage of the proceedings.

11

Finally, Realtime argues that the court must find the patents-in-suit patent eligible because other courts have so held. (D.I. 14 at 6-7). However, these cases were decided by the District Courts for the District of Colorado, Eastern District of Texas, and Central District of California. (*Id.*; D.I. 45, Ex. 1) These decisions are not binding on this court and remain only persuasive authority.

### i. The '535 Patent

Realtime contends that the '535 patent marked an improvement in computer functionality because it "overcame limitations and issues relating to 'a compromise between efficient data storage, access speed, and addressable data space.'" (D.I. 14 at 10) (citing '535 patent at col. 6:31-53) However, Realtime has not identified how the '535 patent solved these issues, or how the solution is reflected in the claim language. Instead, Realtime repeatedly concludes that the Fallon patents provide "technical solutions to technical problems" and are directed to a "particularized subset of novel digital data compression." (*Id.* at 3, 11) Realtime does not provide any evidence to support these statements, or provide any clarity as to what "particularized subset" of data compression the Fallon patents are directed.

The '535 patent does not improve the functioning of a computer. Claim 15 of the '535 patent is drawn to the abstract idea of: (1) determining a parameter, (2) selecting a method of compression, (3) compressing the data with the chosen algorithm, and (4) storing the data. The claims use a wholly generic computer system to obtain functional results of determining a parameter, selecting a compression algorithm, applying that algorithm, and storing the resulting data, with no technical detail describing how to achieve those results. The claims of the '535 patent "do[ ] not sufficiently describe how to achieve" the results "in a non-abstract way." *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1337 (Fed. Cir. 2017).

Similar claims that recite a computer "evaluating and selecting" have been found to be abstract and patent ineligible. *See SmartGene, Inc. v. Advanced Biological Labs., SA*, 555 F. App'x 950, 955 (Fed. Cir. 2014) The Federal Circuit has also found that "the concept of data collection, recognition, and storage is undisputedly well-known." *Content Extraction*, 776 F.3d at 1347.

Netflix asserts that claim 15 of the '535 patent is strikingly similar to the patent at issue in *RecogniCorp, LLC v. Nintendo Co., Ltd.*, 855 F.3d 1322 (Fed. Cir. 2017). (D.I. 13 at 8) Realtime argues that the method described in claim 15 of the '535 patent differs from that in *RecogniCorp* because the method cannot be performed verbally, does not claim mathematical formulas, and discusses data "not easily recognizable to humans." (D.I. 14 at 8) (citing '535 patent, col. 2:28-30) These distinctions are not relevant and Realtime fails to focus on the subject matter of the claims as a whole. *See RecogniCorp*, 855 F.3d at 1326. The method described in the '535 patent resembles that in *RecogniCorp*, which described a method of displaying facial feature images, selecting and manipulating the inputs, deriving an output code, and reproducing the composite image on a second display by performing the sequence in reverse. *Id.* at 1324-25. The Federal Circuit concluded that the patent was directed to the "abstract idea of encoding and decoding image data," and was essentially a process that "started with data, added an algorithm, and ended with a new form of data." *Id.* at 1326-27 (citing *Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*, 758 F.3d 1344, 1350-51 (Fed. Cir. 2014)). Here, claim 15 details a system that applies a compression algorithm based on the data received and then stores the resulting data. The method described here follows the formulaic method of adding an algorithm that changes the data to a new form of data – a method that rendered the claim abstract in *RecogniCorp* and *Digitech*.

Because the '535 patent is directed to an abstract idea, the court must then search for an inventive concept according to *Alice* step two.

### ii. The '477 Patent

Realtime does not provide any specific arguments regarding the '477 patent's patent eligibility. Instead of countering Netflix's arguments regarding each representative claim, Realtime provides arguments addressing all Fallon patents generally. Realtime's briefs linger on certain facets of the '535 patent and, in oral argument, Realtime discussed the '046 patent at length. (D.I. 14 at 10-11; D.I. 42 at 31:22-38:17) However, there are few, if any, arguments specifically addressing the patent eligibility of the other Fallon patents. (*See* D.I. 14 at 1-11) Realtime generally argues that the Fallon patents provide "technological solutions to technological problems" and improve computer functionalities as a "particularized subset of novel digital data compression." (*Id.* at 3, 11) Realtime has not mentioned what the specific technological problems the '477 patent purportedly solves, and has not identified where within the claim language one might deduce such an improvement to computer functionality. *See Enfish*, 822 F.3d at 1335-36; *Two-Way*, 874 F.3d at 1337.

The '477 patent is also directed to an abstract idea. Representative claim 1 of the '477 patent is directed to a system that determines a parameter, selects an encoder, and encodes data. The '477 patent differs from the '535 patent in that at least one of the parameters is a throughput. However, this addition does not render the system described in the '477 patent non-abstract. Like the '535 patent, claim 1 of the '477 patent describes the abstract idea of: (1) determining a parameter, (2) selecting a method of compression, and (3) encoding data. The addition of a throughput does not provide sufficient specificity or improvement to computer functionality that would make the claim non-abstract. "Generic devices do not make a claim non-abstract." *3G*

*Licensing, S.A. v. Blackberry Ltd.*, 302 F. Supp. 3d 640, 652 (D. Del. 2018).[6] Like the '535 patent, the claims in the '477 patent utilize a generic computer system to obtain functional results of determining a parameter, selecting a compression algorithm, and applying that algorithm, with no technical detail of how to achieve these results.

Courts have found the ideas of both selecting and encoding to be abstract ideas. *See SmartGene*, 555 F. App'x at 955; *RecogniCorp*, 855 F.3d at 1326-27. Furthermore, the system described by the '477 patent applies an algorithm to a set of data to receive data in a different form, thereby directing the patent towards an abstract idea similar to the method described in *RecogniCorp*. *See RecogniCorp*, 855 F.3d at 1326-27. Like claim 15 of the '535 patent, the '477 patent is directed towards an abstract idea and must be analyzed under *Alice* step two.

### iii. The '907 Patent

Realtime does not provide any specific arguments regarding the '907 patent's patent eligibility and generally states that the Fallon patents are "technological solutions to technological problems." (D.I. 14 at 11) Claim 1 of the '907 patent describes a system comprising different compression algorithms that applies one or more asymmetric data compression routines and a processor that analyzes data parameters and selects two or more data compression routines. This patent is directed to the abstract idea of analyzing and selecting compression routines, prior to encoding with the selected routine.

The Federal Circuit has rejected patents directed to the idea of "selecting" as abstract and patent ineligible. *See SmartGene*, 555 F. App'x at 955 (concluding that a patent reciting that a computer "evaluat[es] and select[s]" was abstract). Claims directed to the idea of encoding and

---

[6] A timely appeal of this decision to the Federal Circuit was made on April 23, 2018, but the appeal has not yet been decided.

decoding data have also been held abstract. *See RecogniCorp*, 855 F.3d at 1326 ("This method reflects standard encoding and decoding, an abstract concept long utilized to transmit information."). The court in *3G Licensing* recognized that "[s]imply reciting . . . data manipulation steps without additional limitations, constitutes, at step one, an abstract idea." *3G Licensing*, 302 F. Supp. 3d at 652 (internal quotations omitted) (quoting *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 850 F.3d 1332, 1340 (Fed. Cir. 2017)). The manipulation of data outlined in representative claim 1 of the '907 patent is described generally, without any details as to how to compress the data, apart from simply applying one selected compression algorithm and then a second selected compression algorithm. Although two data compression routines are selected, applying two compression algorithms is not any less abstract than applying it once. Accordingly, because the '907 patent is directed to an abstract idea at step one, the court must turn to step two of the *Alice* analysis.

### iv. The '046 Patent

During oral argument, Realtime urged that the '046 patent "chang[ed] the way that [the computer] uses compression to make that compression a better, more useful, functional aspect of the computer." (D.I. 42 at 35:9-11) Netflix, on the other hand, compared the method described in claim 1 of the '046 patent in the following manner: "[i]f what you are using is too slow, pick something from your toolbox that is faster." (*Id.* at 48:20-21) Claim 1 of the '046 patent is directed to the abstract idea of compressing data using compression algorithms and a tracking throughput.

The claims here utilize a generic computer system to obtain the functional result of compressing data with a tracking throughput. Although Realtime claims the '046 patent (and all of the Fallon patents) changed the way computers utilize compression, the claims of the '046

16

patent fail to sufficiently describe how it does so in a non-abstract way. *See Two-Way*, 874 F.3d at 1337; *3G Licensing*, 302 F. Supp. 3d at 651-52. The Federal Circuit has held that claims directed to the idea of encoding and decoding data are abstract. *See RecogniCorp*, 855 F.3d at 1326 ("Morse code, ordering food at a fast food restaurant via a numbering system, and Paul Revere's 'one by land, two if by sea' signaling system all exemplify encoding at one end and decoding at the other end."). The idea of "tracking" has also been deemed abstract, and can be performed manually. *See Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Can. (U.S.)*, 687 F.3d 1266, 1275 (Fed. Cir. 2012). The addition of a tracking throughput does not make the claim non-abstract because it adds another abstract idea to the method that can be performed by a human. The Federal Circuit has noted that "[a]dding one abstract idea . . . to another abstract idea . . . does not render the claim non-abstract." *RecogniCorp*, 855 F.3d at 1327. Therefore, because the asserted claim is directed to the abstract idea of compressing data using algorithms and a tracking throughput, the *Alice* analysis proceeds to step two.

### v. Realtime's Cited Caselaw is Inapposite

Prior to addressing the second step of the *Alice* analysis, the court addresses the general arguments made by Realtime. Realtime relies upon five decisions to generally oppose the motion to dismiss all of the Fallon patents. (*See* D.I. 14 at 2-6)

Realtime argues that Netflix cannot establish that the Fallon patents' claims are directed to an abstract idea under *Alice* step one because the Fallon patents are similar to those in: (1) *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299 (Fed. Cir. 2018), (2) *Enfish*, (3) *Visual Memory*, (4) *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356 (Fed. Cir. 2018), and (5) *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245 (Fed. Cir. 2014). (D.I. 14 at 2-6) However, these cases are inapposite. The Federal Circuit in *Finjan* noted that the patent

17

at issue recited "specific steps . . . that accomplish the desired result" and enabled a "computer security system to do things it could not do before." *Finjan*, 2018 WL 341882, at \*4. The invention in *Finjan* solved a technological problem in a technological manner by fashioning a new way of conducting virus scans. *See id.* at \*3. The Fallon patents are dissimilar in that they do not enable a computer system to do anything it could not already. To the extent that the Fallon patents change a computer system's capabilities, they allow the system to compress data at a faster rate by "picking the right tool for the job." (D.I. 42 at 8:6) This is insufficient for a claim to be considered non-abstract. *See OIP Techs.*, 788 F.3d at 1363 ("[R]elying on a computer to perform routine tasks more quickly or more accurately is insufficient to render a claim patent eligible.").

The court in *Enfish* warned that "describing the claims at such a high level of abstraction and untethered from the language of the claims all but ensures that the exceptions to § 101 swallow the rule." *Enfish*, 822 F.3d at 1337. The patent in *Enfish* described a self-referential table that differed from conventional database structures. *Id.* The Federal Circuit concluded the district court had oversimplified the benefits of the patent at issue to simply "storing, organizing, and retrieving memory in a logical table." *Id.* The claims were an improvement to computer functionality because the self-referential database "did more than allow computers to perform familiar tasks with greater speed and efficiency; it actually permitted users to launch and construct databases in a new way." *Finjan*, 879 F.3d at 1305. Here, the claims do not state a similar claim element that so differs from conventional technology. The Fallon patents generally describe a method of selecting a compression algorithm and then applying it. They do not describe a break from conventional technologies and utilize a generic computer system to implement their invention. The Fallon patents claim to improve the speed at which a computer

18

can perform the task of compressing data. Beyond this, there is no improvement to the computer's functionality.

In *Visual Memory*, the court noted that the patent at issue was not abstract because it was directed to an improvement in computer functionality, not "tasks for which a computer is used in its ordinary capacity." *Visual Memory*, 867 F.3d at 1258 (internal quotations and citations omitted). Here, the Fallon patents are not directed to an improvement in computer functionality. They use generic computer systems as a tool to achieve results incidental to their abstract ideas. *See Enfish*, 822 F.3d at 1335-36 ("[T]he first step in the *Alice* inquiry in this case asks whether the focus of the claims is on the specific asserted improvement in computer capabilities . . . or, instead, on a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool.").

The patent at issue in *Core Wireless* had "no analog to [its] concepts outside the context of [computers and cell phones]." *Core Wireless*, 880 F.3d at 1360. The claim limitations "disclose[d] a specific manner of displaying a limited set of information to the user, rather than using conventional user interface methods." *Id.* at 1363. In other words, the *Core Wireless* patents recited a specific improvement to computer functionality. Here, the Fallon patents describe the use of a generic computer system, utilize a method that can be described outside of the technological context, and are not directed to specific improvements in computer functionality.

Realtime also compares the instant case to that in *DDR*. In *DDR*, the Federal Circuit noted that the patents at issue were not "as technologically complex as an improved, particularized method of digital data compression." *DDR*, 773 F.3d at 1259. Realtime concludes that, based on this statement, the Fallon patents are "unquestionably" patent eligible. (D.I. 14 at

19

6) However, the Federal Circuit decided *DDR* prior to deciding *RecogniCorp*, which explored the patent eligibility of encoding and decoding. Realtime emphasizes the phrase "digital data compression" in the Federal Circuit's opinion, but fails to take the statement in full: "*an improved, particularized method of* digital data compression." *DDR*, 773 F.3d at 1259 (emphasis added). Moreover, in *DDR*, the Federal Circuit noted the distinction between abstract ideas implemented on computers by the use of conventional computer functionality, and solutions that are based on an improvement in the way computers and networks perform. *DDR*, 773 F.3d at 1256; *Epic IP LLC v. Blackblaze, Inc.*, 2018 WL 6201582, at *3 (D. Del. Nov. 26, 2018) ("Numerous Federal Circuit decisions have drawn the distinction between patent-eligible claims that are directed to a specific improvement in the capabilities of computing devices, as opposed to a process that qualifies as an abstract idea for which computers are invoked merely as a tool.") (internal quotation marks and citations omitted). The Fallon patents do not describe an "improved, particularized method of digital data compression," but only direct the computer to select and then apply various existing compression algorithms. *See DDR*, 773 F.3d at 1259.

## B. Whether Realtime Should Be Granted Leave to Amend

Realtime argues in a footnote in its brief that if the court grants Netflix's motion to dismiss, the court must do so without prejudice to amending the complaint because "there certainly [are] allegations of fact that, if . . . accepted, would preclude the dismissal." (D.I. 14 at 15 n.21) (quoting *Aatrix Software, Inc.*, 2018 WL 843288, at *3)[7] Realtime does not provide examples of additions to the complaint that could change the recommended outcome, and the court is not entirely persuaded that Realtime could do so. Therefore, the court recommends denying the request to amend.

---

[7] Netflix has not addressed Realtime's proposal for leave to amend. (*See* D.I. 15)

## C. *Alice* Step 2

Having determined that the Fallon patents are directed to an abstract idea, the court proceeds to the second step of the *Alice* test to determine whether the patent describes an inventive concept. *Alice*, 134 S. Ct. at 2357. For the implementation of an abstract idea on a computer to be considered patent-eligible, it must describe more than "well-understood, routine, and conventional activities previously known in the industry." *Alice*, 134 S. Ct. at 2359 (internal quotations and brackets omitted) (quoting *Mayo*, 132 S. Ct. at 1294).

Realtime argues that the unconventional facets of the Fallon patents are confirmed by the issuance of the patents themselves because the USPTO would necessarily had to have found them to be novel. (D.I. 14 at 15) Realtime conflates the inquiries under § 101 and § 102. "The 'novelty' of any element or steps in a process, or even of the process itself, is of no relevance in determining whether the subject matter of a claim falls within the § 101 categories of possibly patentable subject matter." *Diamond v. Diehr*, 450 U.S. 175, 188-89 (1981). Simply because the USPTO issued the patents does not mean that the Fallon patents are necessarily patent eligible under § 101.

Realtime further asks the court to take judicial notice of the file history of the asserted patents because they are public record. (D.I. 14 at 15 n.20) The court takes judicial notice of the Fallon patents' file histories, but this does not alter the recommended outcome. The court may consider "matters of public record," such as prosecution histories. *See Bruni v. City of Pittsburgh*, 824 F.3d 353, 360 (3d Cir. 2016); *Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc.*, 222 F.3d 951, 957 (Fed. Cir. 2000); Fed. R. Evid. 201(b). However, the file history and the examiner's evaluation of novelty is not relevant to our § 101 analysis. *See Kaavo Inc. v. Cognizant Tech. Sols. Corp.*, C.A. No. 14-1192-LPS, 2016 WL 1268308, at *3 (D. Del. Mar. 31,

2016) (concluding that the claim failed to "provide the inventive concepts needed to impart patentability . . . and the prosecution history . . . does not compel a contrary conclusion"). Therefore, although the court takes judicial notice of the prosecution history, this does not alter the recommendation.

### i. The '535 Patent

The lack of an inventive concept in claim 15 precludes patent eligibility. "[T]he *claim* – as opposed to something purportedly described in the specification – is missing an inventive concept." *Two-Way*, 874 F.3d at 1338 (emphasis in original) (citing *RecogniCorp*, 855 F.3d at 1327).

Realtime argues that the claims of the Fallon patents contain inventive concepts sufficient for patent eligibility.[8] Realtime contends that the combination of claim elements ("(1) asymmetric compressors, (2) two or more compressors, (3) selecting compressor based on parameter/throughput, and/or (4) access profile") in the patents are unconventional technical solutions that transform their abstract ideas into patentable inventions. (D.I. 14 at 13-15) Realtime asserts that the Fallon patents solve several problems, including data storage and retrieval bandwidth limitations, access delays, data rate limitations, and compression ratios. (*Id.* at 13)

"After identifying an ineligible concept at step one, we ask at step two '[w]hat else is there in the claims before us?'" *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1290 (Fed. Cir. 2018) (quoting *Mayo*, 132 S. Ct. at 1297). Here, the alleged unconventional features of

---

[8] Similar to Realtime's arguments regarding *Alice* step one, Realtime does not analyze each representative claim under *Alice* step two beyond a footnote identifying "unconventional technical solutions," but provides overarching arguments for the Fallon patents. (*See* D.I. 14 at 13 n.18)

claim 15 of the '535 patent are the asymmetric compressors and the plurality of compressors.

(D.I. 14 at 13 n.18) However, the claim elements that apply selected compression algorithms are conventional and generic. The patent states that the invention can be implemented using existing compression algorithms with existing "hardware, software, firmware, special purpose processors, or a combination thereof." ('535 patent, col. 20:1-4) "The fact that many of these technologies were well-known can be discerned from [the] patents themselves. The patents mention that the invention can be performed using many types of hardware . . . , suggesting that the hardware used is conventional." *Secured Mail Sols. LLC v. Universal Wilde, Inc.*, 873 F.3d 905, 912 (Fed. Cir. 2017). A computer in a computer implemented invention "must involve more than performance of 'well-understood, routine, [and] conventional activities previously known to the industry'" to be meaningful. *Content Extraction*, 776 F.3d at 1347-48 (citing *Alice*, 134 S. Ct. at 2357).

Claim 15 of the '535 patent is directed towards the abstract idea of selecting between the compressors that are allegedly unconventional. The use of the compressors themselves does not add anything significant, but instead restates part of the abstract idea. The compressors, despite their type or number, do not add an inventive concept to the abstract idea of selecting. *See BSG*, 899 F.3d at 1291 ("As a matter of law, narrowing or reformulating an abstract idea does not add 'significantly more' to it.") (citing *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1168 (Fed. Cir. 2018)).

The patent at issue in *RecogniCorp* described a "particular encoding process using the specific algorithm disclosed," but was still deemed insufficient under *Alice* step two. *RecogniCorp*, 855 F.3d at 1327 (internal quotations omitted). Here, the '535 patent does not disclose any particular encoding process or any specific encoding algorithms, but simply states

that the method described can choose between encoding algorithms and then apply the chosen algorithm. "[T]he claims at issue amount to 'nothing significantly more' than an instruction to apply the abstract idea . . . using some unspecified, generic computer. Under our precedents, that is not 'enough' to transform an abstract idea into a patent-eligible invention." *Alice*, 134 S. Ct. at 2360 (internal quotations, citations, and emphasis omitted). Therefore, I recommend finding that claim 15 of the '535 patent fails *Alice* step two.

### ii. The '477 Patent

Realtime contends that the "plurality of different asymmetric data compression" and the use of a throughput to select an encoder is unconventional, thereby rendering the '477 patent's abstract idea patent eligible. (D.I. 14 at 13 n.18) The court has concluded that claim 1 of the '477 patent is similar to claim 15 of the '535 patent and is directed towards the abstract idea of determining a parameter, selecting an encoder, and encoding data. The fact that there is a plurality of asymmetric data compression does not significantly add to the abstract idea of selecting an encoder; these are merely different compression routines the computer can choose from. *See BSG*, 899 F.3d at 1291. Similarly, mentioning the use of a throughput (or the "bandwidth," a frequency of transmission) does not sufficiently add to the abstract idea to achieve patent eligibility. (*See* '477 patent, col. 11:43-44) The addition of a throughput that the system refers to cannot save the claim because the selection is still simply based on certain parameters – one of which is now a throughput.

Claim 1 of the '477 patent fails to instruct how to achieve any result, but "simply recites an abstract idea, then lists a series of components and says 'configure them.'" *Virginia Innovation Sciences Inc. v. Amazon.com, Inc.*, 227 F. Supp. 3d 582, 602 (E.D. Va. 2017) (citing *Alice*, 134 S. Ct. at 2357 ("[T]ransformation into a patent-eligible application requires more than

24

simply stating the abstract idea while adding the words 'apply it.'") (internal citations and quotations omitted)). There is no inventive concept that transforms the abstract idea of determining a parameter, selecting an encoder, and decoding into a patent eligible invention. *See 3G Licensing*, 302 F. Supp. 3d at 653. "Reciting limitations using such broad functional language without adequately explaining '*how* the desired result is achieved' is not enough at step two." *Id.* (emphasis in original) (citing *Elec. Power Grp.*, 830 F.3d at 1355). Additionally, the claim elements that implement the selected compression algorithms are conventional and generic. The '477 patent recognizes that the invention described is implemented by "various forms of hardware, software, firmware, special purpose processors, or a combination thereof." ('477 patent, col. 20:29-32) The variety of existing technologies that can perform the invention suggests that the invention described in the '477 patent was well-known. *See Secured Mail Sols.*, 873 F.3d at 912; *Content Extraction*, 776 F.3d at 1347-48; *RecogniCorp*, 855 F.3d at 1327-28. Therefore, seeing no inventive concept that transforms the nature of the claims into a patent-eligible application of the abstract idea, the court recommends finding that claim 1 of the '477 patent fails *Alice* step two.

### iii. The '907 Patent

Realtime suggests that claim 1 of the '907 patent passes muster under the second step of *Alice* because the use of "asymmetric data compression" and the selection of compression based on a throughput is unconventional and sufficiently states more than the abstract idea itself. (D.I. 14 at 13 n.18) However, these are similar allegedly unconventional solutions to those claimed for the '477 patent, and they also do not save the '907 patent from patent ineligibility. The use of asymmetric data compression does not significantly add to the abstract idea of analyzing a parameter and selecting multiple data compression routines. The system described is selecting

25

from a plurality of asymmetric data compression routines, and the mere presence of these routines does not add an inventive concept to the abstract idea of selecting among them. *See BSG*, 899 F.3d at 1291. Additionally, these are existing compression routines that are not inventive. The addition of a throughput, a type of parameter, is not an inventive concept that significantly adds to the abstract idea of selecting such that it transforms the nature of the claim into a patent eligible application of the abstract idea.

Further, claim 1 of the '907 patent implements a generic computer system to compress data. The claims of the '907 patent "do[ ] not sufficiently describe how to achieve" the results of compressing data "in a non-abstract way." *Two-Way*, 874 F.3d at 1337. Again, the '907 patent notes that its purported invention "may be implemented in various forms of hardware, software, firmware, special purpose processors, or combination thereof." ('907 patent, col. 20:20-23) As the court has previously concluded, such usage of conventional, generic computer technology to implement the invention is indicative of the well-known nature of the described invention. *See Secured Mail Sols.*, 873 F.3d at 912; *Content Extraction*, 776 F.3d at 1347-48; *RecogniCorp*, 855 F.3d at 1327-28. The claim "broadly recites generic functions, which encompass the abstract idea itself, without providing any details." *3G Licensing*, 302 F. Supp. 3d at 653. Therefore, the court recommends finding that the '907 patent fails under step two of *Alice*.

### iv. The '046 Patent

Realtime alleges that by using two compression routines and selecting one by use of a throughput, claim 1 of the '046 patent describes an inventive concept sufficient to transform the abstract idea into a patent eligible invention. (D.I. 14 at 13 n.18) Compressing data is an abstract idea and reciting that data will be compressed using an unspecified, existing compression algorithm does not add an inventive concept to the abstract idea of compression.

*See RecogniCorp*, 855 F.3d at 1327-28. Claim 1 of the '046 patent provides no other details regarding how the method described adds an inventive concept to data compression. There are even fewer details regarding the encoding process and the algorithms involved than those provided in the patent at issue in *RecogniCorp*, which failed the second step of the *Alice* analysis. *See id.* Although the '046 patent uses a throughput, this usage does not significantly add to the abstract idea of selecting a compression routine with a parameter. This is especially true for the tracking throughput in the '046 patent because tracking is abstract and can be performed manually. *See Bancorp Servs.*, 687 F.3d at 1275. As with the other Fallon patents, the '046 patent states that it can be implemented "in various forms of hardware, software, firmware, special purpose processors, or a combination thereof." ('046 patent, col. 19:54-56) The court reiterates that this suggests that the invention described in the '046 patent was well-known and lacking in an inventive concept sufficient to transform it to a patent eligible invention. *See Secured Mail Sols.*, 873 F.3d at 912; *Content Extraction*, 776 F.3d at 1347-48; *RecogniCorp*, 855 F.3d at 1327-28. Consequently, I recommend finding that the '046 patent fails under step two of *Alice*.

## D. Non-Fallon Patents

Before presenting its more narrowly tailored arguments against the '462 patent and '298 patent claims, Netflix generally argues that none of the claims in Realtime's complaint comply with *Iqbal* and *Twombly*. (D.I. 13 at 15-18) Netflix asserts that the claims "do not point to the actual operation of any Netflix products" but instead "parrot[ ] the claim language and provid[e] 'examples' of several distinct, broadly-defined standardized technologies" without factual support. (*Id.* at 16) Netflix describes how the complaint identifies three product categories and

ten products. (*Id.*) Netflix claims it is left to guess which aspects of the various technologies allegedly infringe the six patents asserted. (*Id.* at 16-17)

"[S]ufficient allegations would include, at a minimum, a brief description of what the patent at issue does, and an allegation that certain named and specifically identified products or product components also do what the patent does." *IP Commc'n Sols., LLC v. Viber Media (USA) Inc.*, C.A. No. 16-134-GMS, 2017 WL 1312942, at *3 (internal quotations omitted) (quoting *Bender v LG Elecs. U.S.A., Inc.*, 2010 WL 889541, at *2 (N.D. Cal. Mar. 11, 2010)).

Realtime's complaint provides factual allegations regarding how Netflix's products infringe the patents-in-suit. However, Netflix argues that Realtime must specifically assert which products infringe in order to place Netflix on notice. (D.I. 13 at 16-18) This is not required. *See IP Commc'n Sols.*, C.A. No. 16-134-GMS, 2017 WL 889541, at *3. Realtime has provided examples of Netflix's products highlighted on "The Netflix Tech Blog" that it claims are using particular technologies that allegedly infringe each of the patents asserted. (*See, e.g.*, D.I. 1 at ¶¶ 16-19) Following these examples, Realtime relates *how* the product's usage of particular technologies allegedly infringes each patent asserted. (*See, e.g., id.* at ¶ 20-24) As this court found in *IP Commc'n Sols.*, C.A. No. 16-134-GMS, 2017 WL 1312942, at *3, "[t]o require that [plaintiff] name a specific infringing product would be nonsensical in this instance. It is unclear how [plaintiff] can be any more specific about what aspects of [defendant's] technology infringe its patent when [plaintiff] likely does not have access to [defendant's] computer code."

Netflix attempts to draw parallels between the case at hand and *Raindance Techs., Inc. v. 10x Genomics, Inc.*, C.A. No. 15-152-RGA, 2016 WL 927143 (D. Del. Mar. 4, 2016), and *Modern Telecom Sys., LLC v. TCL Corp.*, C.A. No. 17-583-LPS-CJB, 2017 WL 6524526 (D. Del. Dec. 21, 2017). (D.I. 13 at 16-17) However, both cases are inapposite. This court, in

*Raindance*, granted the defendant's motion to dismiss because the plaintiff "ma[d]e no attempt to relate any [of] their factual assertions with any of the asserted claims." *Raindance*, C.A. No. 15-152-RGA, 2016 WL 927143, at *2. Here, Realtime has directly argued the asserted claims are infringed by various aspects and methodologies allegedly utilized by Netflix's products. *(See, e.g.*, D.I. 1 at ¶¶ 16-24) Similarly, this court in *Modern Telecom* granted the defendant's motion to dismiss because plaintiff had failed to illustrate how operating pursuant to a particular standard related to infringement of the patents-in-suit. *Modern Telecom*, C.A. 14-583-LPS-CJB, 2017 WL 6524526, at *3. Here, Realtime has conducted a step-by-step analysis to allege that compliance with a standard – namely, the H.264 or H.265 standards – infringes their patents. *(See, e.g.*, D.I. 1 at ¶¶ 20-24)

Ultimately, the court finds Netflix's argument that it was not sufficiently put on notice unpersuasive and recommend denying Netflix's motion to dismiss on these grounds.

### i. The '462 Patent

Netflix argues that Realtime's infringement allegations for the '462 patent rely on Netflix's alleged compliance with the High Efficiency Video Coding ("HEVC") standard,[9] but Realtime's allegations do not specify how the use of this standard infringes the claims of these patents. (D.I. 13 at 18) Additionally, Netflix asserts that claims 1 and 11 of the '462 patent is directed to a process of *encoding* but the HEVC standard only specifies use of a *decoder*. *(Id.* at 18-19) (citing D.I. 1 at ¶ 43; D.I. 41, Ex. B) Netflix contends that *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321 (Fed. Cir. 2010), is controlling authority. In *Fujitsu*, the Federal Circuit decided that courts may "rely on an industry standard in analyzing infringement." *Fujitsu*, 620 F.3d at 1327. The court further held that when "the relevant section of the standard is optional, and

---

[9] The HEVC standard is also known as "H.265." (D.I. 13 at 18)

29

standards [sic] compliance alone would not establish that the accused infringer chooses to implement the optional section[,] . . . the patent owner must compare the claims to the accused products or, if appropriate, prove that the accused products implement any relevant optional sections of the standard." (*Id.* at 1327-28) In response, Realtime contends that this is a factual issue inappropriate for a 12(b)(6) motion, and that the court should take its factual allegation that HEVC is used to both decode and encode as true. (D.I. 14 at 18-19) Realtime argues that *Fujitsu* was decided at the summary judgment stage, not on a motion to dismiss, and, therefore, should not guide the instant analysis. (D.I. 14 at 19 n.28)

At this stage, the court must accept as true all factual allegations in the complaint and view them in the light most favorable to the plaintiff. *See Umland*, 542 F.3d at 64. The portion of the complaint that Netflix references states that "even though the coding algorithms . . . are not specified by the HEVC Spec (as stated in clause 0.7), *this particular combination of choices [in the HEVC Specification] produces a valid bitstream that has to be decoded by a conformant decoder*." (D.I. 1 at ¶ 43) (emphasis added) At the pleadings stage, Realtime's allegations are sufficient to withstand dismissal.

"[I]f an accused product operates in accordance with a standard, then comparing the claims to that standard is the same as comparing the claims to the accused product." *Fujitsu*, 620 F.3d at 1327. Here, Realtime has alleged how compliance with the HEVC standard is connected to infringement of claim 1 of the '462 patent. Paragraphs 38 through 42 of the complaint provide clear examples of how adherence to the HEVC standard also comports with each claim limitation in claim 1 of the '462 patent. (*See e.g.*, D.I. 1 at ¶¶ 38-42; '462 patent, col. 18:20-48) For example, claim 1 of the '462 patent claims, in part, "a method for coding a video signal using hybrid coding." ('462 patent, col. 18:20) The complaint details:

[t]he Accused Instrumentalities performs a method for coding a video signal using hybrid coding. For example, the aim of the coding process is the production of a bitstream, as defined in definition 3.12 of the ITU-T H.265 Series H: Audiovisual and Multimedia Systems, "Infrastructure of audiovisual services – Coding of moving video" High efficiency video coding ("HEVC Spec"): "bitstream: A sequence of bits, in the form of a NAL unit stream or a byte stream, that forms the representation of coded pictures and associated data forming one or more coded video sequences (CVSs)."

(D.I. 1 at ¶ 38) (internal citations omitted) Further examples and explanations connecting the HEVC standard with claim 1 of the '462 patent, complete with computer code, are provided in the paragraphs thereafter. (*Id.* at ¶¶ 38-49) By not only alleging that Netflix's products infringe the '462 patent, but also identifying common elements between the HEVC standard and claim 1 of the '462 patent, Realtime's complaint has adequately alleged direct infringement. *See Stragent, LLC v. BMW of N. Am., LLC*, 2017 WL 2821697, at \*5 (E.D. Tex. Mar. 3, 2017) (citing *Fujitsu*, 620 F.3d at 1327; *Audio MPEG, Inc. HIP Inc. v. Società Italiana Per Lo Sviluppo Dell' Elettronica Spa*, 2016 WL 7010947 (E.D. Va. July 1, 2016)).

Finally, Netflix asserts that Realtime has failed to allege any facts supporting the allegation that the "Netflix products *actually* implement any of the accused encoder functionality." (D.I. 13 at 19) However, the averments are accepted as true and it would be premature at this stage for the court to make recommendations on issues which will undoubtedly be the subject of fact and expert discovery. Therefore, it is recommended that Netflix's motion to dismiss with respect to the '462 patent should be denied.

## ii. The '298 Patent

Netflix argues that its motion to dismiss the '298 patent should be granted because Realtime relies heavily on a portion of the HEVC standard and does not allege that "the '298 patent claims cover every possible implementation of the HEVC standard." (D.I. 13 at 19-20) Specifically, Netflix contends that the HEVC specification at issue relates to decoding multiple

31

"tiles" that are not always used with every HEVC video stream. (*Id.* at 19) According to

Netflix, these tiles are only used when a variable, "titles_enabled_flag," is set to 1. (*Id.* at 19-20)

(citing D.I. 41, Ex. B at 83) Netflix asserts that Realtime fails to allege that "titles_enabled_flag"

is equal to 1 in any of the accused products. (*Id.*) Realtime counters that its complaint alleges

that Netflix performs each limitation and how Netflix performs each limitation. (D.I. 14 at 20)[10]

Realtime "must connect either the accused products to the asserted claims, or the [HEVC

standard] to the asserted claims." *Stragent*, 2017 WL 2821697, at *5 (internal quotations

omitted) (citing *Fujitsu*, 620 F.3d at 1327). Here, Realtime has identified how compliance with

the HEVC standard is connected to infringement of claim 1 of the '298 patent. Paragraphs 81

through 86 of the complaint provide clear examples of how adherence to the HEVC standard

also comports with each claim limitation in claim 1 of the '298 patent. (*See e.g.*, D.I. 1 at ¶¶ 81-

86 (pg. 40-42); '298 patent, col. 5:50-6:2) For example, claim 1 of the '298 patent claims, in

part, a method of "receiving the video stream which comprises at least one composite frame

containing a pair of stereoscopic digital images (L, R) according to a predetermined frame

packing format." ('298 patent, col. 5:52-55) The complaint details:

> [t]he Accused Instrumentalities receive the video stream which comprises at least
> one composite frame (FC), each composite frame containing a pair of
> stereoscopic digital images (L,R) according to a predetermined frame packing
> format. For example, the coded bitstream when it contains a stereoscopic video in
> one of the frame packing arrangements such as side-by-side or top-and-bottom or
> segmented rectangular frame packing format as defined in the following sections
> of the ITU-T H.265 Series H: Audiovisual and Multimedia Systems,
> "Infrastructure of audiovisual services – Coding of moving video" High
> efficiency video coding ("HEVC Spec"): D.2.16 Frame packing arrangement SEI
> message syntax, D.3.16 Frame packing arrangement SEI message semantics,
> D.2.29 Segmented rectangular frame packing arrangement SEI message syntax,
> D.3.29 Segmented rectangular frame packing arrangement SEI message
> semantics.

---

[10] Realtime's complaint makes no mention of "titles_enabled_flag." (*See* D.I. 1 at ¶ 77-95 (pg. 38-45))

(D.I. 1 at ¶ 81) Further examples and explanations connecting the HEVC standard with claim 1 of the '298 patent, complete with computer code, are provided in the paragraphs thereafter. (*Id.* at ¶¶ 81-87) By not only alleging that Netflix's products infringe the '298 patent, but also identifying common elements between the HEVC standard and claim 1 of the '298 patent, Realtime's complaint has adequately alleged direct infringement. *See Stragent*, 2017 WL 2821697, at *5 (citing *Fujitsu*, 620 F.3d at 1327; *Audio MPEG*, 2016 WL 7010947). Therefore, it is recommended that Netflix's motion to dismiss with respect to the '298 patent should be denied.

### E. Indirect Infringement Claim

To establish indirect infringement, a patent owner has available two theories: active inducement of infringement and contributory infringement. *See* 35 U.S.C. § 271(b) & (c). Liability for indirect infringement may arise "if, but only if, [there is] . . . direct infringement." *Limelight Networks, Inc. v. Akamai Techs., Inc.*, 134 S. Ct. 2111, 2117 (2014) (citing *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 341 (1961) (emphasis omitted)).

Under 35 U.S.C. § 271(b), "whoever actively induces infringement of a patent shall be liable as an infringer." "To prove induced infringement, the patentee must show direct infringement, and that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement." *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1363 (Fed. Cir. 2012) (internal quotations omitted). "[I]nduced infringement under § 271(b) requires knowledge that the induced acts constitute patent infringement." *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754 (2011). The knowledge requirement can be met by a showing of either actual knowledge or willful blindness. *See id.* "[A] willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and

who can almost be said to have actually known the critical facts." *Id.* at 2070-71. "[I]nducement requires evidence of culpable conduct, directed to encouraging another's infringement, not merely that the inducer had knowledge of the direct infringer's activities." *DSU Med. Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006) (citations omitted).

To establish contributory infringement, the patent owner must demonstrate the following: (1) an offer to sell, sale, or import; (2) a component or material for use in a patented process constituting a material part of the invention; (3) knowledge by the defendant that the component is especially made or especially adapted for use in an infringement of such patents; and (4) the component is not a staple or article suitable for substantial noninfringing use. *See Fujitsu*, 620 F.3d at 1326 (citing 35 U.S.C. § 271(c)). Defendant "must know 'that the combination for which his component was especially designed was both patented and infringing.'" *Global-Tech*, 563 U.S. at 763 (citing *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 488 (1964)).

In support of its motion to dismiss, Netflix contends that the complaint fails to allege the requisite pre-suit knowledge to support a post-suit claim of indirect infringement and, as such, requests that the court dismiss all claims for induced and contributory infringement. (D.I. 13 at 20) In response, Realtime counters that Netflix does not dispute that post-filing indirect infringement allegations are sufficient and that this argument is merely an attempt to "carve up indirect infringement by time frame" as a "damages issue inappropriate for dismissal at this stage." (D.I. 14 at 20)

"[T]he filing of a complaint is sufficient to provide knowledge of the patents-in-suit for purposes of stating a claim for indirect infringement occurring after the filing date." *SoftView LLC v. Apple Inc.*, C.A. No. 10-389-LPS, 2012 WL 3061027, at *7 (D. Del. July 26, 2012); *see also Telecomm Innovations, LLC v. Ricoh Co., Ltd.*, 966 F. Supp. 2d 390, 393 (D. Del. 2013);

*Versata Software, Inc. v. Callidus Software Inc.*, 944 F. Supp. 2d 357, 362-63 (D. Del. 2013);

*Apeldyn Corp. v. Sony Corp.*, 852 F. Supp. 2d 568, 573-74 (D. Del. 2012); *Walker Digital, LLC*

*v. Facebook, Inc.*, 852 F. Supp. 2d 559, 565 (D. Del. 2012); *Minkus Elec. Display Sys. Inc. v.*

*Adaptive Micro Sys. LLC*, C.A. No. 10-666-SLR, 2011 WL 941197, at *3-4 (D. Del. Mar. 16,

2011). These cases reason that "an accused infringer is on notice of the patent(s)-in-suit once an

initial pleading identifies the patents-in-suit, and a patentee that successfully proves the

remaining legal elements of indirect infringement is entitled to recover for any post-filing

indirect infringement of those patents." *SoftView*, 2012 WL 3061027, at *7. In *Apeldyn* and

*Walker Digital*, the court concluded that a plaintiff may plead actual knowledge of the patents-

in-suit as of the filing of the initial complaint to state a cause of action limited to the defendant's

post-litigation conduct, and a defendant's decision to continue its conduct despite knowledge

gleaned from the complaint is sufficient to establish the intent element required to state a claim

for indirect infringement. *See Apeldyn*, 852 F. Supp. 2d at 573-74; *Walker Digital*, 852 F. Supp.

2d at 565-66. The court confirmed that pre-suit knowledge of the patent must be alleged unless

the plaintiff limits its cause of action for indirect infringement to post-litigation conduct. *See*

*Apeldyn*, 852 F. Supp. 2d at 573-74; *Walker Digital*, 852 F. Supp. 2d at 565-66.

In the present action, Realtime alleges that Netflix was on notice of each of the patents-

in-suit "since at least the filing of this Complaint or shortly thereafter." (*See, e.g.*, D.I. 1 at ¶ 29)

Thus, Netflix's post-filing date knowledge of the patents-in-suit is sufficient to state a claim for

indirect infringement occurring after service of the complaint. In view of the foregoing

authority, I recommend that the court grant-in-part the motion to dismiss to the extent that

Realtime's complaint could be construed to assert causes of action for indirect infringement

based on pre-filing conduct, and deny the motion with respect to Netflix's post-filing date notice.

## V.    CONCLUSION

For the foregoing reasons, I recommend the court grant-in-part and deny-in-part the defendants' motion to dismiss. (D.I. 11)

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2). The objections and responses to the objections are limited to ten (10) pages each. The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the District Court. *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the court's Standing Order For Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the court's website, http://www.ded.uscourts.gov.

Dated: December 12, 2018

Sherry R. Fallon
UNITED STATES MAGISTRATE JUDGE